UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TOM OGNIBENE, et al. | : |
| | : |
| Plaintiffs, | : No. 08-CV-1335 (LTS) (TDK) |
| | : |
| v. | : |
| | : |
| JOSEPH P. PARKES, S.J., et al., | : |
| | : |
| Defendants. | : |
| | : |

## AMICUS CURIAE BRIEF OF CITIZENS UNION, COMMON CAUSE/NY, AND NEW YORK PUBLIC INTEREST RESEARCH GROUP IN SUPPORT OF DEFENDANTS

PROSKAUER ROSE LLP
Peter J.W. Sherwin
John H. Snyder
Seth D. Fier
1585 Broadway
New York, NY 10036
Tel: 212.969.3000
Fax: 212.969.2900

*Counsel for Amici Citizens Union,*
*Common Cause/NY, and*
*New York Public Interest Research Group*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTERESTS OF AMICI CURIAE........................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................................. 3

FACTUAL BACKGROUND..................................................................................................... 5

     A.    The Pay-To-Play Corruption Scandals Of The 1980s............................................. 5

     B.    Voters Demand Action On "Pay-to-Play" ............................................................... 8

     C.    Voters Endorse The Corporate Contribution Ban.................................................. 10

ARGUMENT ............................................................................................................................. 11

I.     The Court Should Apply A Deferential Standard Of Review To Closely
     Drawn Contribution Limits Enacted Through The Political Process. ................................... 11

     A.    Contribution Limits Are Subject To "Relatively Complaisant
           Review.".................................................................................................................... 12

     B.    Unlike In *Randall*, The Doing Business Limits Are Closely Drawn
           And Pro-Competitive. ............................................................................................. 14

II.    The City's Interest In Curbing Actual and Perceived Corruption Justifies
     The Doing Business Limits. ................................................................................................. 15

     A.    Courts Routinely Uphold Two-Tier Contribution Limits. ..................................... 16

     B.    The Doing Business Limits Are Not Overinclusive. ............................................... 19

     C.    The Doing Business Limits Are Not Underinclusive. ............................................. 20

           1.    The City Is Not Required To Enact Special Limits For
                Unions Or Neighborhood Associations......................................................... 20

           2.    Facially Neutral Contribution Limits Are Not Invalid Based
                On Speculation Of A Disparate Impact......................................................... 22

III.   The Entity Contribution Ban Is A Proper Means Of Preventing
     Circumvention Of Contribution Limits. ............................................................................... 23

CONCLUSION.......................................................................................................................... 25

# TABLE OF AUTHORITIES

Pages

**CASES**

*Asseo v. Pan Am. Grain Co.*,
  805 F.2d 23 (1st Cir. 1986) .................................................................................................. 5

*Austin v. Mich. State Chamber of Commerce*,
  494 U.S. 652 (1990) ....................................................................................................... 21-24

*Blount v. SEC*,
  61 F.3d 938 (D.C. Cir. 1995) ................................................................................ 18-19, 21, 23

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ..................................................................................................... Passim

*California Prolife Council PAC v. Scully*,
  989 F. Supp. 1282 (E.D. Cal. 1998), *aff'd*, 164 F.3d 1189 (9th Cir. 1999) ...................... 17-18

*Casino Ass'n of La. v. State es rel. Foster*,
  820 So. 2d 494 (La. 2002) ................................................................................................. 19

*FEC v. Beaumont*,
  539 U.S. 146 (2003) .................................................................................................... 3, 13

*FEC v. Colo. Republican Fed. Campaign Comm.*,
  533 U.S. 431 (2001) ........................................................................................................ 13

*FEC v. Nat'l Conservative Political Action Comm.*,
  470 U.S. 480 (1985) ........................................................................................................ 25

*FEC v. Nat'l Right to Work Comm.*,
  459 U.S. 197 (1982) ........................................................................................................ 25

*Flynt Distrib. Co. v. Harvey*,
  734 F.2d 1389 (9th Cir. 1984) ............................................................................................ 5

*Gwinn v. State Ethics Comm'n*,
  262 Ga. 855 (1993) .......................................................................................................... 19

*Heideman v. S. Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003) .......................................................................................... 5

*Hill v. Colorado*,
  530 U.S. 703 (2000) ........................................................................................................ 23

*In re Earle Asphalt Co.,*
  950 A.2d 918 (N.J. App. Div. 2008)....................................................................................14, 19

*In re Petition of Soto,*
  236 N.J. Super. 303 (App. Div. 1989) .................................................................................19

*Inst. of Governmental Advocates v. Fair Political Practices Comm'n,*
  164 F. Supp. 2d 1183 (E.D. Cal. 2001).................................................................................19

*Kimbell v. Hooper,*
  164 Vt. 80 (1995)...................................................................................................................19

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,*
  51 F.3d 982 (11th Cir. 1995) ..................................................................................................5

*McConnell v. FEC,*
  540 U.S. 93 (2003)..........................................................................................................13, 21

*N.C. Right to Life, Inc. v. Bartlett,*
  168 F.3d 705 (4th Cir. 1999) ................................................................................................19

*New York City Friends of Ferrets v. City of New York,*
  876 F. Supp. 529 (S.D.N.Y. 1995) .......................................................................................21

*Randall v. Sorrell,*
  548 U.S. 230 (2006)........................................................................................................ 14-15

*Republican Party of Minn. v. White,*
  536 U.S. 765 (2002)..............................................................................................................22

*Schiller Park Colonial Inn, Inc. v. Berz,*
  63 Ill. 2d 499 (1976) .............................................................................................................19

*Sierra Club, Lone Star Chapter v. FDIC,*
  992 F.2d 545 (5th Cir. 1993) ..................................................................................................5

*State v. Alaska Civil Liberties Union,*
  978 P.2d 597 (Alaska 1999)..................................................................................................19

*Torres Rivera v. Calderon Serra,*
  412 F.3d 205 (1st Cir. 2005)..................................................................................................23

*Ty, Inc. v. GMA Accessories, Inc.,*
  132 F.3d 1167 (7th Cir. 1997) ................................................................................................5

*United States v. Dinwiddie,*
  76 F.3d 913 (8th Cir. 1996) ..................................................................................................23

*United States v. O'Brien,*
   391 U.S. 367 (1968)...................................................................................................23

*United States v. Weslin,*
   156 F.3d 292 (2d Cir. 1998)........................................................................................23

*Wachsman v. City of Dallas,*
   704 F.2d 160 (5th Cir. 1983) ......................................................................................19

**STATUTES, RULES AND REGULATIONS**

52 RCNY 1-04 (2007) ..........................................................................................................24

52 RCNY § 1-04(h)(5)(i)(2) ................................................................................................11

NYC Charter § 1052(a)(11)-(12) ....................................................................................8, 10

NYC Charter § 1052(a)(13) .................................................................................................10

N.Y. Elec. Law § 14-112 ......................................................................................................12

NYC Administrative Code § 3-211 ......................................................................................20

NYC Administrative Code § 3-702(3)(h) .........................................................................3, 12

NYC Administrative Code § 3-702(8).................................................................................12

NYC Administrative Code § 3-702(18)............................................................................20-21

NYC Administrative Code § 3-703(1)(l).......................................................................3, 12, 23

NYC Administrative Code § 3-703(a-1).........................................................................3, 12

NYC Administrative Code § 3-719 .......................................................................................10

NYC Local Law 34 (2007) .....................................................................................................9

NYC Local Law 60 (2004) ...................................................................................................10

NYC Local Law 67 (2007) .....................................................................................................9

**OTHER AUTHORITIES**

New York City Campaign Finance Board, Advisory Op. 1999-4 (Jan. 15, 1999)........................10

Clifford J. Levy, *Mayor Vetoes Bill to Tighten Limits on Campaign Giving*, N.Y. Times,
   Sept. 26, 1998 .........................................................................................................10

Frank Anechiarico et ano., *Purging Corruption From Public Contracting: The 'Solutions' Are Now Part of the Problem*, 40 N.Y.L. Sch. L. Rev. 143, 147-148 (1995) .......................................................................................................................... 5-6

Interim Report of the New York City Campaign Finance Board on "Doing Business" Contributions, June 19, 2006 ........................................................................................... 8-9, 15

Jeffrey D. Friedlander et al., *The New York City Campaign Finance Law*, 16 Hofstra L. Rev. 345 (Winter 1988) ...................................................................................................7

John D. Feerick, *Improper 'Pay to Play'*, N.Y. Times, Mar. 28, 1997 ...........................................6

Joyce Purnick, *Flaws Cited in New York Campaign Finance Law*, N.Y. Times, Dec. 4, 1988...............................................................................................................................7

L. Tribe, American Constitutional Law § 16-4 (1988) .................................................................22

Laurence D. Laufer and Jisha S. Vachachira, *City Revamps Campaign Finance Law*, N.Y.L.J. July 17, 2007 ...................................................................................................7

Michel Marriott, *The 1988 Elections:  New York City Charter; Rules on Mayoral Succession and Anti-Corruption Voted*, N.Y. Times, Nov. 9, 1988 ...........................................7

Michael Oreskes, *The Corruption Scandals:  What Went Wrong and Their Impact on the System*, N.Y. Times, March 23, 1987 ...........................................................................6

Michael Waldman, *The End of Influence*, N.Y. Times, Jan. 6, 2006 ...........................................5

NYC Campaign Finance Board, Report on the 2005 Elections............................................. Passim

Report, Committee on Governmental Operations, June 12, 2007 .................................9, 11, 17, 24

Amici curiae Citizens Union, Common Cause/NY, and New York Public Interest Research Group ("Amici") submit this amicus brief in opposition to Plaintiffs' motion for a preliminary injunction (Dkt. No. 15) and in support of Defendants' cross-motion for summary judgment (Dkt. No. 46).

## INTERESTS OF AMICI CURIAE[1]

**Citizens Union** is an independent, nonpartisan organization dedicated to promoting good government and political reform in the city and state of New York. One of America's first good government groups, Citizens Union was founded in 1897 to fight the corruption of Tammany Hall, and in 1901, Citizens Union helped to elect Seth Low as the City's first reform mayor. In its long history as a watchdog for the public interest and an advocate for the common good, Citizens Union has spearheaded efforts for campaign finance reform, historic preservation, improved voting procedures, City Charter revisions, home rule for New York City and proportional representation. By informing the policy debate, Citizens Union works to ensure fair elections, clean campaigns, and open, effective government that is accountable to the citizens of New York. Based on its belief that an informed citizenry is the cornerstone of a thriving local democracy, the Citizens Union Foundation publishes *Gotham Gazette*, a front row seat to New York City policies and politics. In the last two years, Citizens Union has filed three amicus briefs concerning campaign finance issues in New York state and federal courts.

**Common Cause/NY** is the statewide chapter of Common Cause, a nonpartisan, not-for-profit advocacy organization founded in 1970 in New York by John Gardner as a vehicle for citizens to make their voices heard in the political process and to hold their elected leaders

---

[1]  By endorsed letter dated July 16, 2008, the Court granted Amici leave to file this amicus brief. No counsel for a party authored this brief in whole or in part. No person other than Amici, their members, or their counsel made a monetary contribution to its preparation or submission.

1

accountable to the public interest.  With 400,000 members nationwide and 20,000 members in New York State, Common Cause supports open, honest, and accountable government at all levels, working to restore ethics in government and curb the influence of special interest money in politics.  Common Cause/NY has a track record of three decades of good government victories, including playing a leading role in the enactment of the City's campaign finance system in the late 1980s, the amendments of the late 1990s, and most recently, the 2007 amendments at issue in this case (*see infra* at 5-11).

      **New York Public Interest Research Group ("NYPIRG")** is a nonpartisan, not-for-profit student-directed membership organization with chapters on 21 college campuses and more than 80,000 supporters within New York State.  In its 35 years of existence, NYPIRG has made governmental reform work a central focus of its issue agenda.  In the wake of the City's political scandals of the 1980s (*see infra* at 5-7), NYPIRG played a central role in the reform effort, issuing studies concerning the shortcomings of the City's laws, speaking to community boards and groups across the City about the need for reform, working with the City Council and Charter Revision Commission in drafting the 1988 Campaign Finance Act, and successfully organizing a broad grassroots "Vote Yes" campaign in support of the 1988 campaign finance referendum (*see infra* at 6-7).  In the two decades since the Act was enacted, NYPIRG has consistently monitored the workings of the act and advocated for its improvement.  In addition, NYPIRG strongly advocates for overhauling the state's dysfunctional campaign finance system, as well as working for reform in election administration, ballot access, and the drawing of legislative districts.

*    *    *

      The City's campaign finance law is a nationwide model for campaign finance reform.  The outcome of this case is likely to have far-reaching impacts, beyond the immediate parties to this action.  For this reason, Amici, with their combined 184 years of promoting honesty and

2

transparency in our representative institutions in the City and beyond, have a significant interest in the issues here presented.

## SUMMARY OF ARGUMENT

Amici urge the Court to uphold the constitutionality of recently enacted provisions of the New York City Campaign Finance Act, codified at Sections 3-703(a-1), 702(3)(h), and 703(1)(l) of the New York Administrative Code, which Plaintiffs challenge on First Amendment and Equal Protection grounds. The challenged provisions relate to restrictions on campaign contributions to candidates for public office in New York City ("the City"). Sections 3-703(a-1) and 702(3)(h) (the "Doing Business limits") provide that persons having business dealings with the City are subject to lower contribution limits, and that contributions by such persons are not eligible for matching under the City's public finance program. Section 3-703(1)(l) extends the longstanding ban on corporate contributions (not challenged here) to cover contributions by LLCs, LLPs and partnerships (the "Entity Contribution ban").

Under the seminal case of *Buckley v. Valeo*, 424 U.S. 1 (1976) and its progeny, limits on campaign contributions are subject to a far lower degree of scrutiny than limits on independent expenditures, which the City does not limit. Contribution limits will be upheld if they are aimed at curbing apparent or actual corruption, provided they are "closely drawn." This standard of review is highly deferential to the judgment of the legislature, which is uniquely qualified to understand the effects of money in politics. Indeed, the Supreme Court recently coined the term "complaisant scrutiny" to describe its approach to reviewing contribution limits such as those at issue here. *FEC v. Beaumont*, 539 U.S. 146, 161-162 (2003).

Recent history shows that the Doing Business limits are critical to the City's ongoing effort to curb actual or apparent political corruption. In the 1980s, the City suffered a series of major corruption scandals involving a practice known as "pay-to-play," which refers to political

3

contributions given to curry political favor in the pursuit of government contracts, land use determinations, and other discretionary actions. In 1988, in the wake of the pay-to-play scandals, the City enacted its Campaign Finance Act – which established contribution limits, required regular reporting and disclosure of campaign expenses and contributions and eventually put in place a public funds matching program – becoming one of the first major cities to adopt such legislation. A decade later, in 1998, the voters demanded action on the pay-to-play issue, approving a referendum calling for regulation of contributions by those doing business with the City.

The City Council in 2007 finally enacted a law addressing the pay-to-play system, with its centerpiece being the Doing Business limits at issue here. The City crafted the Doing Business limits in a targeted and closely drawn manner. Rather than imposing lower limits on all contributors, the City applied the lower limits to the small subset of contributors who have business dealings with the City and who, as a result, create the greatest risk of engaging in pay-to-play. As set forth more fully below, the Doing Business limits represent a targeted and closely drawn response to a genuine voter concern, expressed at the ballot box, regarding pay-to-play. Under *Buckley* and its progeny, the Doing Business limits plainly pass the "complaisant scrutiny" test, and should be upheld.

Plaintiffs also challenge the Entity Contribution ban, which seeks to close loopholes in the campaign finance law that permitted owners of LLPs, LLCs, and partnerships to evade contribution limits. The Supreme Court routinely upholds prophylactic measures designed to prevent circumvention of contribution limits. Under the deferential standard of review that applies to such measures, the Entity Contribution ban is clearly constitutional.

4

## FACTUAL BACKGROUND[2]

### A.     The Pay-To-Play Corruption Scandals Of The 1980s

Modern campaign finance reform in the City dates back to the mid-1980s, when major

political corruption scandals fractured public confidence in the integrity of City government.

The flashpoint was the revelation that the City's Parking Violations Bureau ("PVB") had

exploited loopholes to award sweetheart contracts for collecting parking fines to companies with

connections to top PVB officials and Democratic Party bosses Donald Manes and Stanley

Friedman.  Even when competitive bids were sought, the process was fixed, with well-connected

contractors playing a hidden role in writing the City's specifications.[3]  These scandals led to the

imprisonment of party leaders and the suicide of Mr. Manes, the Queens Borough president.[4]  A

public furor followed, leading to the discovery of numerous other, similar scandals.  The New

York Times reflected on these scandals in March 1987:

> It is more than a year since Donald R. Manes, the Queens Borough
> President, killed himself after being implicated in a bribery ring. The furor
> that followed has been an enduring one, as new revelations about the inner
> workings of the city's political structure continue to emerge.

---

[2]   Amici's factual recitation cites numerous publications, including reports of City government
agencies, legislative materials, and articles from the scholarly, legal, and popular press.  Courts
considering preliminary injunction motions may consider such materials.  *Asseo v. Pan Am.
Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986) ("[a]ffidavits and other hearsay materials are often
received in preliminary injunction proceedings."); *Heideman v. S. Salt Lake City*, 348 F.3d 1182,
1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction
hearings."); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997); *Levi Strauss
& Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985-86 (11th Cir. 1995); *Sierra Club, Lone
Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993); *Flynt Distrib. Co. v. Harvey*, 734 F.2d
1389, 1394 (9th Cir. 1984).

[3]   Frank Anechiarico, et ano., *Purging Corruption From Public Contracting:  The 'Solutions'
Are Now Part of the Problem*, 40 N.Y.L. Sch. L. Rev. 143, 147-148 (1995) ("Anechiarico").

[4]   Michael Waldman, *The End of Influence*, N.Y. Times, Jan. 6, 2006, at A21.  (Snyder
Declaration Exhibit A).

> Some of these revelations are of corruption: envelopes of money passed in men's rooms. Others have been of the lowgrade sort that in a more tolerant era were labeled "honest graft": no show jobs and political influence peddling.
>
> New Yorkers have been inundated with reports of graft, proven and unproven; stories of conflicts of interest, real or apparent, and avowals of integrity, heartfelt or obligatory. Some of the episodes were closely related. Others share only the common thread that they occurred at Democracy's most delicate point: the intersection of politics and government.[5]

In the wake of these scandals, the City's Charter Revision Commission held hearings at which the State Comptroller testified that \$2 billion, or 40 percent of all City contracts, were awarded without competitive bidding. The Comptroller concluded that the no-bid contracts were so poorly managed that they had become an open invitation to steal.[6] Another commission formed in response to the scandals, a statewide Commission on Government Integrity led by John D. Feerick, then Dean of Fordham University School of Law, examined similar issues in the City as well as statewide. Reflecting on his investigation, Feerick would later write that his commission "uncovered numerous examples of contributions going from the legal, financial and real estate communities to municipal officials with whom they did business." He added, "[t]his creates a substantial appearance of a 'pay to play' practice, damaging confidence in government. Such an appearance of impropriety should be eliminated. . . ."[7]

In February 1988, amid the scandals and investigations, the City Council passed Local Law 8, which provided that candidates who conformed to spending and contribution limits would be eligible to receive public funds. In the November 1988 elections, about 80 percent of voters approved a host of anti-corruption measures proposed by the Charter Revision

---

[5] Michael Oreskes, *The Corruption Scandals: What Went Wrong and Their Impact on the System*, N.Y. Times, March 23, 1987, at B4. (Exhibit B).

[6] Anechiarico at 148.

[7] John D. Feerick, *Improper 'Pay to Play'*, N.Y. Times, Mar. 28, 1997, at A28. (Exhibit C).

6

Commission, which included empowering the newly formed Campaign Finance Board (the "Board") to administer the public campaign funding program.[8]

Even at this early stage in the City's experience with campaign finance reform, it was recognized that, to remain effective, the law would have to be reviewed and adapted to keep up with changing conditions. Mayor Ed Koch called the Campaign Finance Act "the most fundamental reform of the political process ever enacted by the city."[9]  At the same time, Mayor Koch recognized the law's limitations. "I'm not going to tell you this is a perfect law," he said, "but it's angelic compared to existing state legislation."[10]  Others closely involved in the development of the law noted, "[w]ith the public financing of elections, the City of New York will be embarking on new, untested waters."[11]  As was presciently observed at the time: "Despite best efforts to create an effective, workable law, experience will undoubtedly indicate that changes should be made.  The Campaign Finance Board is empowered to review the workings of the law and make such recommendations as it deems appropriate to assure meaningful reform."[12]  Experience has borne this out.  As predicted, the law has been amended frequently over the years, such revisions having "been found necessary to maintain an effective reform, one that continues to be hailed as a national model."[13]

---

[8]  Michel Marriott, *The 1988 Elections:  New York City Charter; Rules on Mayoral Succession and Anti-Corruption Voted*, N.Y. Times, Nov. 9, 1988, at B4.  (Exhibit D).

[9]  Jeffrey D. Friedlander, et al., *The New York City Campaign Finance Law*, 16 Hofstra L. Rev. 345, 345 (Winter 1988) ("Friedlander, *Campaign Finance Law*").

[10]  Joyce Purnick, *Flaws Cited in New York Campaign Finance Law*, N.Y. Times, Dec. 4, 1988, at Sec. 1, Part 2, p. 54.  (Exhibit E).

[11]  Friedlander, *Campaign Finance Law*, at 354.

[12]  *Id.*

[13]  Laurence D. Laufer and Jisha S. Vachachira, *City Revamps Campaign Finance Law*, N.Y.L.J. July 17, 2007, at 4.  (Exhibit F).

**B.     Voters Demand Action On "Pay-to-Play"**

A decade after the Campaign Finance Act was first enacted, the voters demanded action

on pay-to-play, approving by a 60 percent vote a ballot question "requiring disclosure and

regulation of contributions by those doing business with the City of New York . . . ."[14]  In the

intervening decade, the Campaign Finance Board proceeded deliberately, reluctant to promulgate

Doing Business regulations without the technical means to enforce them and a legislative

mandate from the City Council.[15]  The Campaign Finance Board extensively studied the issue,

publishing a report, in connection with the NYU Wagner School of Public Service, which

highlighted the need for Doing Business limits.[16]  The Report found that contributors with

business dealings with the City contributed far in excess of their relative numbers.  For instance,

in 2001, Doing Business contributors were 3.8 percent of all contributors, but they accounted for

25.2 percent of dollars contributed.  In 2005, they were 5.3 percent of all contributors and

accounted for 21.5 percent of dollars.  In one Borough President election in 2001, Doing

Business contributors made up 8 percent of all contributors but accounted for 81.7 percent of

dollars.[17]

---

[14]   Defs. Rule 56.1 Stmt., ¶ 19; NYC Charter § 1052(a)(11)-(12).

[15]   NYC Campaign Finance Board, Report on the 2005 Elections ("2005 CFB Report") at 122-
23.  (Exhibit G).

[16]   Interim Report of the New York City Campaign Finance Board on "Doing Business"
Contributions, June 19, 2006 ("Doing Business Report") (Exhibit H).  It should be noted that the
Doing Business Report was based on available statistical information regarding historical
activity, not a prediction of future activity, and that the definition of "doing business" used in the
report differs slightly from the definition that was ultimately adopted.  With those caveats, the
Doing Business Report clearly sketches out broad trends regarding the growing impact of Doing
Business contributions.

[17]   Doing Business Report at 12-13.

In 2007, the City Council passed, and Mayor Bloomberg signed into law, the Doing

Business limits now before the Court.[18]  The Doing Business limits were not imposed insular

bureaucrats, but by elected officials who are directly accountable to the voters, and who have

vast collective experience with campaigns, fundraising, and the intersection of money and

politics.  The Doing Business limits address pay-to-play, which lay at the heart of the scandals of

the 1980s, as the legislative history confirms:

> While there is nothing intrinsically wrong with contributions from those
> doing business with the City, the ability of such individuals to contribute
> could create a perception, regardless of whether such perception is accurate,
> that such individuals have a higher level of access to the City's elected
> officials.   It is important to eradicate this perception and reduce the
> appearance of undue influence associated with contributions from
> individuals doing business with the City.[19]

Importantly, the City's focus in adopting the Doing Business limits was not simply how best to

eradicate pay-to-play, but how to achieve this without unduly burdening those who are unlikely

ever to engage in pay-to-play.  When the Doing Business limits were being considered, the

Campaign Finance Board carefully considered the effect of imposing these limits on all

contributors.  "Casting a wide net has the potential to discourage the individual contributor from

lawfully participating in the political process and undermines one of the central purposes of the

Act."  The Board added that "an effective regulation would target those five percent, rather than

casting a net that encompasses the 95 percent of donors who are not [doing business with the

City]."[20]  In enacting the Doing Business limits, the City Council followed the Board's

recommendation that restrictions be narrowly targeted.

---

[18]  NYC Local Law 34 (2007) (Exhibit I), later amended by NYC Local Law 67 (2007) (Exhibit J).

[19]  Report, Committee on Governmental Operations, June 12, 2007 at § V(A) (Exhibit K).

[20]  2005 CFB Report at 124.

## C.   Voters Endorse The Corporate Contribution Ban

In addition to calling for action on pay-to-play, the voters in 1998 also endorsed a

prohibition on corporate contributions to candidates participating in the public funding system, a

ban that was extended to all candidates (whether or not they participated in public financing) in

2004.[21]  While the 1998 referendum was being considered, observers were aware that simply

banning *corporate* contributions would leave loopholes:

> While the Mayor has said banning corporate contributions would be an
> important change, many campaign finance experts disagree.  They point out
> that executives of corporations could still donate as individuals, and note
> that many large donations in city elections come from political action
> committees, as well as from law and real estate firms and other
> partnerships, which would not be barred from giving.[22]

As enacted in 1998, however, the prohibition on corporate contributions did not expressly cover

non-corporate business organizations like LLCs, LLPs, and partnerships.  Shortly after the ban

on corporate contributions was adopted, the Campaign Finance Board confirmed that it would

not expand the ban on corporate contributions to cover non-corporate entities without a clear

mandate.[23]

That mandate came in 2007, when the City Council adopted the Entity Contribution ban

at issue in this case, a measure that bars contributions from any "limited liability company,

limited liability partnership, or partnership."  The legislative history shows that the City Council,

---

[21]  New York City Charter, § 1052(a)(13) ("the board shall prohibit candidates for offices
covered by the voluntary system of campaign finance reform from accepting, either directly or
indirectly, a campaign contribution, loan, guarantee or other security for such loan, from any
corporation.").  In 2004, the City Council passed (over the Mayor's veto) a measure, codified at
§ 3-719, which applied the ban on corporate contributions to all candidates, regardless of
participation in the public finance system.  NYC Local Law 60 (2004).

[22]  Clifford J. Levy, *Mayor Vetoes Bill to Tighten Limits on Campaign Giving*, N.Y. Times,
Sept. 26, 1998, at B4.  (Exhibit L).

[23]  NYC Campaign Finance Board, Advisory Op. 1999-4 (Jan. 15, 1999).  (Exhibit M).

in adopting the Entity Contribution ban, sought to close a loophole that permitted owners or

managers of such entities to evade contribution limits:

> The Act prohibits participants and non-participants from accepting corporate contributions. However, there is a loophole in the law that permits similarly structured business entities, such as limited liability companies ("LLC"), limited liability partnerships ("LLP") and partnerships are still permitted [*sic*] to contribute up to the full contribution limit. Although contributions from these entities are not matchable with public funds, permitting these business entities to contribute has been a way to subvert the contribution limits because the Board rules only require that organizational contributions be attributed to the partner or owners where the contribution is greater than two thousand five hundred dollars.[24]

In addition, as the Board concluded following the 2005 elections, non-corporate entities pose "a

particular transparency problem" because:

> many are involved in city business (especially land use), yet often there is no information in the public record about a particular LLC's owners or principals. Indeed, LLCs are growing more active as a source of campaign funds; while they represented 2.8 percent of total contributions to participants in 2001, they gave 6.2 percent of all funds raised in 2005 by participants. Prohibiting these contributions is one important way to minimize the impact of "doing business" contributors.[25]

Thus, the purpose behind the Entity Contribution ban was essentially prophylactic, in that it

closed loopholes that impeded enforcement of other campaign finance restrictions.

## ARGUMENT

I.     **The Court Should Apply A Deferential Standard Of Review To Closely Drawn Contribution Limits Enacted Through The Political Process**

In 1998, the voters sent a clear message, calling on the City to take action addressing pay-

to-play in City contracts. The City Council answered that call in 2007, enacting comprehensive

---

[24]   Report, Committee on Governmental Operations, June 12, 2007 at § V(B); *see also* 52 RCNY § 1-04(h)(5)(i)(2) (LLC contributions imputed to members only where contribution exceeds $2,500).

[25]   2005 CFB Report at 121-22.

legislation designed to eliminate the perception and reality of the pay-to-play system. Plaintiffs now challenge the Doing Business limits enacted by the City Council. In sum and substance, Plaintiffs ask this Court to overturn the will of the voters and to overrule the City Council's policy judgments regarding the role of money in politics, a subject in which elected officials have special expertise. In the three decades since *Buckley v. Valeo*, 424 U.S. 1 (1976), courts have repeatedly reaffirmed *Buckley*'s holding that courts should respect the legislative judgment that contribution limits are essential to preserve the public's faith in our representative institutions. The Doing Business limits reflect the conclusion, based on the accumulated experience of the City's elected representatives, empirical evidence, and popular mandate, that such limits are critical to maintaining the public's faith in the legitimacy of government. This legislative judgment merits judicial deference.

### A.   Contribution Limits Are Subject To "Relatively Complaisant Review"

Plaintiffs are challenging limits on *contributions*, not on *independent expenditures*.[26] The Supreme Court has held that "restrictions on political contributions have been treated as merely 'marginal' speech restrictions *subject to relatively complaisant review* under the First

---

[26]   Plaintiffs challenge the lower *contribution* limits applicable to persons Doing Business with the City (§ 3-703(a-1)), as well as the exclusion of those contributions from eligibility for matching (§ 3-702(3)(h)). Plaintiffs also challenge the ban on *contributions* from LLCs, LLPs, and partnerships (§ 3-703(1)(l)).

Nothing in the challenged provisions limits independent expenditures. In fact, section 3-702(8) expressly provides that independent expenditures are not deemed contributions (and therefore not subject to contribution restrictions) if they are "made, taken or performed by a person or a political committee independent of the candidate or his or her agents or political committees authorized by such candidate pursuant to section 14-112 of the New York state election law."

The contribution limits and the "matching funds" restriction both have the effect of curbing "pay-to-play." As Plaintiffs make the same arguments against both, and offer no authority that these closely related provisions are subject to different legal tests, they are addressed together.

Amendment, because contributions lie closer to the edges than to the core of political expression." *FEC v. Beaumont*, 539 U.S. 146, 161-162 (2003) (emphasis added).  The "complaisant review" standard starkly contrasts with the far more exacting scrutiny that applies when the government seeks to limit expenditures (which the City has not done).  *See FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001) ("limits on political expenditures deserve closer scrutiny than restrictions on political contributions.").  Because of the dramatically different legal standards, the Court has "routinely struck down limitations on independent expenditures by candidates, other individuals, and groups . . . while repeatedly upholding contribution limits. . . ."  *Id.* at 441 (citations omitted).

Under *Buckley* and it progeny, contribution limits are valid if the government demonstrates "a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Buckley*, 424 U.S. 1, 25 (1976). Moreover, "the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits." *McConnell v. FEC*, 540 U.S. 93, 143 (2003). That interest is not limited to eliminating brazen cash-for-vote exchanges, but extends to combating "the appearance or perception of corruption engendered by large campaign contributions." *Id.* Further, the Court has emphasized that the "closely drawn" test is a "less rigorous standard of review," far less exacting than strict scrutiny. *See McConnell*, 540 U.S. at 137 (when reviewing contribution limits, "there is no place for a strong presumption against constitutionality, of the sort often thought to accompany the words 'strict scrutiny.'"). This test "shows proper deference to Congress' ability to weigh competing constitutional interests in an area in which it enjoys particular expertise. It also provides Congress with sufficient room to anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process." *Id.*

**B.**     **Unlike In *Randall*, The Doing Business Limits Are Closely
Drawn And Pro-Competitive**

The contribution limits at issue in this case are particularly worthy of deferential review,

as is clear from a comparison of this case and *Randall v. Sorrell*, 548 U.S. 230 (2006), an

inapplicable case on which Plaintiffs mistakenly rely.  Plaintiffs seize upon *Randall*, no doubt

because it is one of the rare cases that actually struck down a contribution limit.  The limit in

*Randall*, which applied to Vermont state elections, was an across-the-board contribution limit of

$400 or lower (depending on the office).  In striking down this limit, the *Randall* Court

expressed concern that the low limit was really an incumbent protection act.  *Id.* at 248-249

("contribution limits that are too low can also harm the electoral process by preventing

challengers from mounting effective campaigns against incumbent officeholders.").  Unlike in

*Randall*, the Doing Business limits are closely drawn, likely to affect only a small subset of

contributors who pose special risks of engaging in pay-to-play.[27]  The limit here is manifestly not

an incumbent protection act; indeed, the Doing Business restrictions will be pro-challenger and

not pro-incumbent.

Historically, in City politics, incumbents almost never lose.  In 2005 – before any of the

challenged contribution limits took effect – 51 incumbents ran for re-election.  One lost.[28]  The

dominance of incumbents is at least partially explained by their fundraising advantage.  In 2005,

incumbent City Council candidates on average outraised challengers by a margin of $160,727 to

---

[27]     *Accord In re Earle Asphalt Co.*, 950 A.2d 918, 926-27 (N.J. App. Div. 2008) (limits on
"doing business" contributions justified under *Randall* because "the particular danger that
contractors' campaign contributions may influence the discretionary decisions of State
contracting officials or create a public perception of such influence establishes the 'special
justification' for the contribution limits . . . that the Court found lacking in *Randall*.").

[28]     2005 CFB Report at 38.

$30,927.[29] The Doing Business limits will lessen incumbents' dominance. As the Campaign Finance Board noted following the 2005 elections, "incumbents – who can exert influence on particular city decisions as elected officials – have much greater access to these large donations [from those Doing Business with the City] than do non-incumbent candidates."[30] Statistics support this conclusion. Doing Business contributors account for only a small percentage of all contributors (3.8 percent in 2001, 5.3 percent in 2005), but make up a large percentage of those contributing $2,000 or more (20.8 percent in 2001, 16.8 percent in 2005).[31] Incumbents have historically relied more heavily than challengers upon large contributions (including from Doing Business contributors), while challengers depend far more heavily upon smaller contributions.[32] Thus, the Doing Business limits are likely to be pro-competitive, unlike in *Randall*, where the evidence suggested the opposite.[33]

## II.     The City's Interest In Curbing Actual and Perceived Corruption Justifies The Doing Business Limits

Plaintiffs do not contest the general point that preventing actual or apparent corruption is a valid justification for contribution limits, nor do they dispute that pay-to-play is a real concern.

---

[29]  2005 CFB Report at 40.

[30]  2005 CFB Report at 122. It is not surprising that incumbents would benefit disproportionately from Doing Business contributions. A campaign contribution cannot succeed in purchasing influence unless the candidate wins. Since incumbents virtually always win, it would make little sense for an influence-seeker to contribute to a challenger.

[31]  Doing Business Report at 12-14.

[32]  In 2005, challengers raised 53 percent of their funds through contributions of $250 or less, while incumbents raised only 25 percent through such small contributions. *See* 2005 CFB Report at 43.

[33]  In a similar vein, the Entity Contribution ban will have a similar pro-competitive effect. In the 2005 elections, the average incumbent for a Council seat collected 78 contributions from organizations, totaling $43,500. The average challenger gathered only two contributions from organizations, totaling $1,800. 2005 CFB Report at 120.

Plaintiffs instead attack the *means* used to accomplish the City's anti-corruption purposes. First, Plaintiffs argue in essence that a campaign finance law that features a two-tier contribution limit is *per se* invalid. This argument has no legal merit, and ironically, it assails a valuable tool for crafting closely drawn limits. Second, Plaintiffs claim the Doing Business limits are underinclusive and overinclusive. In making this argument, Plaintiffs invite the Court to fine tune the City Council's drafting of the Doing Business limits – something the Supreme Court has held is not the role of the courts. *Buckley*, 424 U.S. at 30 (a contribution limit was not invalid merely because of a legislative "failure to engage in . . . fine tuning.").

### A.   Courts Routinely Uphold Two-Tier Contribution Limits

In adopting the two-tier contribution limits (*i.e.*, lower limits for those Doing Business than for other contributors), the City clearly intended to address the problem of pay-to-play while minimizing the burden on the vast majority of contributors who create little or no risk of engaging in pay-to-play. This is a textbook example of a closely drawn contribution limit – targeting the problem while minimizing collateral damage. Plaintiffs seize upon this two-tier feature as a reason for striking down the Doing Business limits, implicitly urging the Court to hold that two-tier contribution limits are *per se* unconstitutional. (Pltfs. Mem. at 15.) This argument is wholly without merit, and paradoxically, if Plaintiffs were to have their way, it would undermine the very values they profess to support by making it more difficult to craft closely drawn campaign finance laws.

To support their argument that the two-tier limits are invalid, Plaintiffs assert, *ipse dixit*, that the higher contribution limits applicable to those not Doing Business with the City were deemed to be "non-corrupting" in all cases. (Pltfs. Mem. at 15.) Based on this false premise, Plaintiffs claim that the lower Doing Business limits are therefore unnecessary, and consequently, not closely drawn.

16

Plaintiffs' argument does not hold. Not all contributors create identical risks of corruption. City contractors, lobbyists, and others who earn their livelihood soliciting government business create special risks of engaging in pay-to-play. This risk is heightened by the fact that many of those who solicit government contracts also engage in lobbying, which by definition aims to procure favorable government decisions. The voters in 1998, and the City Council in 2007, determined that the perception or reality of pay-to-play required a legislative response – a conclusion supported by the historical fact that pay-to-play was at the heart of the scandals of the 1980s. In adopting the lower Doing Business limits, the City Council emphasized, "[i]t is important to eradicate this perception and reduce the appearance of undue influence associated with contributions from individuals doing business with the City."[34] Plaintiffs' claim that the City Council, in adopting the Doing Business limits, was really declaring its judgment that those limits were unnecessary is absurd.

Plaintiffs rely on a single, easily distinguishable case for the proposition that two-tier contribution limits are improper. In *California Prolife Council PAC v. Scully*, 989 F. Supp. 1282 (E.D. Cal. 1998) ("*Scully*"), *aff'd*, 164 F.3d 1189 (9th Cir. 1999), lower contribution limits were placed on contributions to candidates who refused to accept expenditure limits, while candidates who adhered to voluntary expenditure limits could accept larger contributions. The key distinction is that, in *Scully*, the two-tier contribution limits were not aimed at curbing the influence of a class of contributors who created a high risk of corruption. Rather, the contribution limits in *Scully* were aimed at encouraging *candidates* to accept expenditure restrictions. As the *Scully* court concluded, there was no connection between the lower limits and the constitutionally cognizable purpose of curbing actual or apparent corruption; rather, the

---

[34]   Report, Committee on Governmental Operations, June 12, 2007 at § V(A).

lower limit related to "a constitutionally noncognizable value, namely limitations on expenditures." *Id.* at 1296.

Where, as here (and in contrast to *Scully*), the two-tier limits aim at curbing apparent or actual corruption, courts routinely affirm them. This is particularly true where the lower restrictions affect individuals such as lobbyists and those doing business with the government, who are often viewed as making contributions not to support a candidate's ideas, but to buy influence. For instance, in *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995), the court upheld an SEC rule that sought to curb pay-to-play practices by municipal bond underwriters. The SEC rule recognized that cities and states often issue municipal bonds, and municipal securities dealers stand to make substantial fees if they are chosen to underwrite a bond offering. The SEC rule addressed the concern that securities dealers were making political contributions to win the favor of politicians who could steer underwriting business to them – classic pay-to-play. Specifically, the rule provided that brokers and dealers and their professional employees could not do business with any bond issuer (*e.g.*, a city government) for two years following any political contribution to an elected official of that issuer (*e.g.*, a city council member).[35]

In upholding the SEC rule, the *Blount* court noted that "underwriters' campaign contributions self-evidently create a conflict of interest in state and local officials who have power over municipal securities contracts and [create] a risk that they will award the contracts on the basis of benefit to their campaign chests rather than to the governmental entity." *Id.* at 944-45. Moreover, the court found the restriction to be "closely drawn," noting that the rule, while limiting campaign contributions, left open other avenues for political expression. *Id.* at 947-48

---

[35]   The Rule included a carve-out that allowed a municipal finance professional to contribute up to $250 per election to each official for whom he or she is entitled to vote, without triggering the business bar.

("municipal finance professionals are not in any way restricted from engaging in the vast majority of political activities, including making direct expenditures for the expression of their views, giving speeches, soliciting votes, writing books, or appearing at fundraising events.").[36] As in *Blount*, many other courts have endorsed restrictions *or even complete prohibitions* on contributions by classes of contributors who raise a particular risk of actual or apparent corruption (*e.g.*, lobbyists, city contractors).[37] There is no merit to Plaintiffs' claim that two-tier contribution limits fail the "closely drawn" test.

## B.    The Doing Business Limits Are Not Overinclusive

Plaintiffs claim the Doing Business restrictions are over-inclusive because they include individuals who Plaintiffs say "have never and would never give contributions in an attempt to secure a quid pro quo benefit," such as "secretaries of lobbyists and their family members." (Pltfs. Mem. at 15-16.) Plaintiffs are mistaken. Secretaries of lobbyists and their families are not subject to the lower contribution limits.[38] Moreover, as noted elsewhere, prophylactic measures

---

[36]   The Doing Business provisions currently before the Court, like the SEC rule in *Blount*, address contributions, not any other kind of political expression.

[37]   *In re Earle Asphalt Co.*, 950 A.2d 918, 926-27 (N.J. App. Div. 2008) (contribution limit for government contractors); *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 718 (4th Cir. 1999) (sessional ban on lobbyist contributions); *Kimbell v. Hooper*, 164 Vt. 80, 85-86 (1995) (same); *Inst. of Governmental Advocates v. Fair Political Practices Comm'n*, 164 F. Supp. 2d 1183, 1192 (E.D. Cal. 2001) (ban on contributions by lobbyists to offices lobbied); *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 619-20 (Alaska 1999) (ban on out-of-district contribution by lobbyists); *Wachsman v. City of Dallas*, 704 F.2d 160, 173 (5th Cir. 1983) (ban on contributions by city employees); *Casino Ass'n of La. v. State ex rel. Foster*, 820 So. 2d 494, 509 (La. 2002) (ban on contributions by casinos); *In re Petition of Soto*, 236 N.J. Super. 303, 321 (App. Div. 1989) (ban on contributions by casino employees); *Gwinn v. State Ethics Comm'n*, 262 Ga. 855, 857-858 (1993) (ban on contributions by insurance companies to candidates for Commissioner of Insurance); *Schiller Park Colonial Inn, Inc. v. Berz*, 63 Ill. 2d 499, 511-13 (1976) (ban on contributions by liquor industry).

[38]   The definition of Doing Business includes lobbyists (§ 3-702(16)), which in turn incorporates by reference the definition of lobbyist contained in § 3-211, providing that "[t]he term 'lobbyist'

designed to prevent circumvention of contribution limits are routinely upheld, and thus, even if the City were to ban contributions by a lobbyist's secretary, it would likely pass muster.

### C.     The Doing Business Limits Are Not Underinclusive

Plaintiffs offer two meritless arguments for why the Doing Business limits are underinclusive. First, Plaintiffs claim the City Council cannot regulate Doing Business contributions without simultaneously enacting a separate law limiting contributions from unions and neighborhood associations that are not Doing Business with the City. Second, Plaintiffs claim the Doing Business limits are invalid based on speculation that they will have a disparate impact on government contractors.

### 1.     The City Is Not Required To Enact Special Limits For Unions Or Neighborhood Associations

Plaintiffs misleadingly claim the lower contribution limits for those Doing Business with the City "are . . . underinclusive because they fail to restrict contributions from other contributors, including labor organizations and neighborhood associations, even though they engage in the same types of activities and compete for the same types of contracts, grants, and concessions from the city as those individuals and entities which are subject to the lower limits." (Pltfs. Mem. at 16.) This is a red herring. Unions and neighborhood associations are not exempt from the Doing Business limits.[39] If a union or neighborhood association has dealings with the City that bring it within the "business dealings with the city" definition (§ 3-702(18)), those limits apply.

---

shall mean every person or organization retained, employed or designated by any client to engage in lobbying." The limits do not cover secretaries or their family members.

[39]   As stated in City's Memorandum of Law, there are narrow exceptions for rezoning applications of certain neighborhood associations. (Defs. Mem. at 17, n.6.)

Thus, Plaintiffs' argument has nothing to do with unions and neighborhood associations receiving preferential treatment under the Doing Business limits. Rather, the argument is that the Doing Business limits are fatally underinclusive because there might be a policy argument for applying separate contribution limits to unions and neighborhood associations for reasons other than Doing Business activities.

Plaintiffs identify no authority or doctrinal framework that would support their argument. To the contrary, the Supreme Court held in this context that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *McConnell v. FEC*, 540 U.S. 93, 207-208 (quoting *Buckley*, 424 U.S. at 105)). Even if Plaintiffs could show that special limits for unions and neighborhood associations might help curb apparent or actual corruption (and they have not), that would not render the existing Doing Business restrictions invalid. As the court held in *Blount*:

> [A] regulation is not fatally underinclusive simply because an alternative regulation, which would restrict more speech or the speech of more people, could be more effective. The First Amendment does not require the government to curtail as much speech as may conceivably serve its goals.... Thus, with regard to First Amendment *under*inclusiveness analysis, neither a perfect nor even the best available fit between means and ends is required.

61 F.3d at 946 (emphasis in original) (citations omitted).[40] *Cf. Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652, 666 (1990) (upholding expenditure limits applicable to corporations but not unions).

---

[40] One reaches the same result when approaching the issue as an equal protection question. *See New York City Friends of Ferrets v. City of New York*, 876 F. Supp. 529, 533-34 (S.D.N.Y. 1995), aff'd 71 F.3d 405 (2d Cir.) ("The courts . . . show great deference to legislatures' choices in creating classifications, even where those classifications seem imperfect. A law will not fail to pass constitutional muster under equal protection analysis merely because it contains classifications which are underinclusive – that is, which 'do not include all who are similarly situated with respect to a rule, and thereby burden less than would be logical to achieve the

21

Plaintiffs' reliance on *Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ("*White*") is misplaced. *White* involved a direct restriction on candidate speech (not a contribution limit) that was held to be underinclusive under a strict scrutiny analysis (not applicable here). (Pltfs. Mem. at 16.) The issue in *White* was whether a rule barring candidates for judicial office from announcing their views "on disputed legal or political issues" during the campaign could be justified as promoting the appearance of open-mindedness. *Id.* at 768, 778. The Court struck down this rule, holding that "statements in election campaigns are . . . an infinitesimal portion of the public commitments to legal positions that judges (or judges-to-be) undertake." *Id.* at 774-75, 779. Thus, the Court concluded, "[a]s a means of pursuing the objective of open-mindedness that respondents now articulate, the announce clause is so woefully underinclusive as to render belief in that purpose a challenge to the credulous." *Id.* at 780. Here, by contrast, there is no reason for anyone to doubt that the City is genuinely seeking to curb actual or apparent corruption.

## 2.    Facially Neutral Contribution Limits Are Not Invalid Based On Speculation Of A Disparate Impact

Despite the facial neutrality of the Doing Business limits, which apply equally regardless of the identity of the person Doing Business with the City, Plaintiffs speculate (without any evidence) that the lower limits will be applied more frequently to those in the business community than to other categories of contributors. From this premise, Plaintiffs extrapolate further (again without evidence), generalizing that individuals Doing Business with the City have a "significantly different viewpoint" than other groups that Plaintiffs predict will be less frequently affected by the Doing Business limits. (Pltfs. Mem. at 16-17.)

---

intended government end.'") (citing L. Tribe, American Constitutional Law § 16-4 at 1447 (1988)).

Putting aside this fatal lack of evidence, Plaintiffs' "disparate impact" theory also fails as a matter of law. A plaintiff cannot make out a First Amendment violation simply by showing that a facially neutral law has the practical effect of burdening one viewpoint more heavily than another. *United States v. O'Brien*, 391 U.S. 367 (1968) (upholding a law that prohibited the destruction of draft cards even though most people who burned their draft cards were opponents of the Vietnam War); *United States v. Weslin*, 156 F.3d 292, 297 (2d Cir. 1998) ("It is irrelevant whether, in practice, most of those prosecuted under FACE are anti-abortion protestors. First Amendment law does not recognize disparate impact claims."); *U.S. v. Dinwiddie*, 76 F.3d 913, 923 (8th Cir. 1996) ("there is no disparate-impact theory in First Amendment law"). Even if Plaintiffs were to claim the Doing Business limits were imposed specifically to burden a particular viewpoint (and they cannot), the fact that the legislative history shows a non-discriminatory purpose (*see supra* at 8-9) behind the facially neutral Doing Business limits would end that inquiry. *Hill v. Colorado*, 530 U.S. 703, 719-20 (2000) (content-neutrality inquiry in First Amendment context ends if stated legislative reason is content-neutral and the statute is facially neutral); *Torres Rivera v. Calderon Serra*, 412 F.3d 205, 210-11 (1st Cir. 2005) (same). Accordingly, Plaintiffs' "disparate impact" theory fails as a matter of law.[41]

## III.   The Entity Contribution Ban Is A Proper Means Of Preventing Circumvention Of Contribution Limits

Finally, Plaintiffs challenge § 703(1)(l), the Entity Contribution ban, which prohibits candidates for city office from accepting contributions from LLCs, LLPs, or partnerships. In the first place, Plaintiffs' heavy reliance on *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652

---

[41]   Plaintiffs' Equal Protection claim is even weaker. As the court noted in *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995), addressing the same argument, "We find it unnecessary to evaluate this contention. The Fifth Amendment requires only that the government have a rational basis for its distinction . . . ; and rational-basis review requires, if anything, less 'mathematical nicety' . . . than the First Amendment requires." *Id.* at 946 n.4 (citations omitted).

(1990) is puzzling. (Pltfs. Mem. at 11.) *Austin* involved a law barring *corporations* from

making *independent expenditures* in state elections. What is more, in *Austin*, this far more

ambitious restriction was actually upheld under a strict scrutiny review not applicable here. It is

unclear why Plaintiffs would cite *Austin*.

The legislative history makes clear that the Entity Contribution ban was intended to

prevent circumvention of contribution limits:

> Although contributions from these entities are not matchable with public
> funds, permitting these business entities to contribute has been a way to
> subvert the contribution limits because the Board rules only require that
> organizational contributions be attributed to the partner or owners where the
> contribution is greater than two thousand five hundred dollars.[42]

Conceivably, the City Council could have tried to close that loophole in other ways. Prior to the

2007 legislation, contributions by LLCs exceeding $2,500 were imputed to the individual

members. The City could have imputed *all contributions* from non-corporate business entities to

the partners or members. Had the City Council chosen that approach, the net effect would have

been the same (in theory): owners and members of non-corporate entities would be subject to

the same contribution limits as anyone else, regardless of whether the contribution was made

directly or through an intermediary. It is doubtful anyone would have challenged that approach.

Instead, the City chose another means of preventing circumvention of the contribution

limits, and for good reason. The "imputation" approach would have been virtually impossible to

enforce. Business enterprises like hedge funds and real estate developers are often made up of

dozens, if not hundreds of partnerships or LLCs linked together in a complex ownership

structure. One can imagine the administrative nightmare that would result from trying to trace a

$100 contribution from an LLC through layers upon layers of interlocking partnerships, all to

---

[42]   Report, Committee on Governmental Operations, June 12, 2007 at § V(B) (citing 52 RCNY
1-04 (2007)).

24

determine the individuals to whom that contribution should ultimately be imputed. The result of

the imputation approach would have been a massive waste of City resources and, quite likely,

toothless enforcement. Of course, as noted above, in adopting prophylactic measures to prevent

this kind of circumvention, the City is entitled to great deference. *See, e.g., FEC v. Nat'l*

*Conservative Political Action Comm.*, 470 U.S. 480, 500 (1985) (recognizing the "proper

deference to a congressional determination of the need for a prophylactic rule where the evil of

potential corruption had long been recognized"); *FEC v. Nat'l Right to Work Comm.*, 459 U.S.

197, 210 (1982) ("Nor will we secondguess a legislative determination as to the need for

prophylactic measures where corruption is the evil feared."). Thus, the Entity Contribution ban

is a valid measure to prevent circumvention, and should be upheld.

## CONCLUSION

Based on the foregoing, Amici urge the Court to uphold the constitutionality of all of the

challenged provisions of the campaign finance law, to deny Plaintiffs' motion for a preliminary

injunction, and to enter summary judgment for the Defendants.


Dated:    New York, New York            PROSKAUER ROSE LLP
          August 13, 2008
                                        By: _____

                                        Peter J.W. Sherwin
                                        John H. Snyder
                                        Seth D. Fier
                                        1585 Broadway
                                        New York, NY 10036
                                        (212) 969-3000

                                        *Counsel for Amici Citizens Union,*
                                        *Common Cause/NY, and*
                                        *New York Public Interest Research Group*

25