UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
TOM OGNIBENE, YVETTE VELAZQUEZ BENNET,
VIVIANA VAZQUEZ-HERNANDEZ, ROBERT PEREZ,
FRAN REITER, SHEILA ANDERSEN-RICCI,
MARTINA FRANCA ASSOCIATES, LLC,
REITER/BEGUN ASSOCIATES, LLC,
DENIS GITTENS, OSCAR PEREZ, THE KINGS
COUNTY COMMITTEE OF THE NEW YORK STATE
CONSERVATIVE PARTY, THE NEW YORK STATE
CONSERVATIVE PARTY, MARTIN DILAN, and
MARLENE TAPPER,

           Plaintiffs,

     -v-                                   No.  08 Civ. 1335 (LTS)(FM)

JOSEPH P. PARKES, S.J, in his official capacity as
Chairman of the New York City Campaign Finance Board,
DALE C. CHRISTENSEN, JR., KATHERYN C. PATTERSON,
and MARK S. PIAZZA, in their official capacity as members of
New York City's Campaign Finance Board, MARK DAVIES,
in his official capacity as Executive Director of the New York City
Conflicts of Interest Board, and MONICA BLUM,
STEVEN ROSENFELD, ANDREW IRVING, and
ANGELA M. FREYRE, in their official capacity as members
of New York City's Board of Conflicts of Interest, and
MICHAEL MCSWEENY, in his official capacity as
Acting City Clerk of New York City,

           Defendants.
-------------------------------------------------------x

OPINION AND ORDER

APPEARANCES:

DAVIDOFF, MALITO & HUTCHER, LLP
    By: Charles Capetanakis, Esq.
605 Third Avenue, 34th Floor
New York , NY 10158

THE BOPP LAW FIRM
    By: James Bopp, Jr., Esq. (*pro hac vice*)
        Anita Y. Woudenberg, Esq. (*pro hac vice*)
1 South Sixth Street
Terre Haute , IN 47807

*Attorneys for Plaintiffs*

NYC LAW DEPARTMENT, OFFICE OF
THE CORPORATION COUNSEL
    By: Jonathan L. Pines, Esq.
100 Church Street
New York , NY 10007

*Attorney for Defendants*

PROSKAUER ROSE LLP
    By: Peter J.W. Sherwin, Esq.
        Matthew J. Morris, Esq.
        Jamison Davies, Esq.
        David Munkittrick, Esq.
11 Times Square
New York , NY 10036

*Attorney for Amici Citizens Union*

THE BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
    By: J. Adam Skaggs, Esq.
        Mark Ladov, Esq.
        David Early, Esq.
161 Avenue of the Americas, 12th Floor
New York, NY 10013

*Attorney for Amici the Brennan Center,*
*Common Cause/NY, the League of Women*
*Voters of New York City and New York*
*Public Interest Research Group*

JENNER & BLOCK LLP
    By: Paul M. Smith, Esq.
        Michael W. Ross, Esq.
        Joshua H. Rubin, Esq.
        Randall Adams, Esq.
919 Third Avenue
New York, NY 10022

*Attorney for Amici Brad Lander and Mark*
*Winston Griffith*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiffs, who intend to run for public office in New York City or to contribute to candidates' campaigns,[1] bring this action for declaratory and injunctive relief against the Defendants -- the chairmen and members of New York City's Campaign Finance and Conflicts of Interest Boards and acting City Clerk -- asserting that certain provisions of New York City's political campaign finance laws violate the First and Fourteenth Amendments to the Constitution of the United States.  Specifically, Plaintiffs challenge provisions of the New York City Administrative Code ("Administrative Code" or "Code") which raise expenditure limits or permit additional matching funding for candidates participating in public financing when their opponents' spending and contribution receipts cross certain thresholds, or when certain other circumstances are present.  Plaintiffs assert that these provisions of the Administrative Code unduly burden protected political speech and association rights in violation of the First Amendment and deny equal protection of the laws in violation of the Fourteenth Amendment, both facially and as applied.  The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a).

Plaintiffs filed an original and an amended complaint in February 2008.  Shortly thereafter, Plaintiffs sought a preliminary injunction as to Counts II, III, IV, VII and VIII of the Amended Complaint, and Defendants cross-moved for partial summary judgment as to the same counts.[2]  The Court denied Plaintiffs' motion and granted Defendants' motion, upholding the

---

[1]     Plaintiff Tom Ognibene intended to run for City Council as a non-incumbent, nonparticipating (i.e. non-publicly financed) candidate in 2009.  (Plaintiffs' 56.1 Statement at ¶ 21).  Plaintiffs Sheila Andersen-Ricci, Robert Perez, Fran Reiter, Frank Ricci, Martina Franca Associates, LLC, Reiter Begun Associates, LLC, Denis Gittens, and Oscar Perez intend to contribute to candidates' campaigns in upcoming elections.  (Id. at ¶ 23.)

[2]     These Counts challenged provisions of the Code, commonly known as the "pay-to-play" rules, which reduced to levels below the generally-applicable campaign

constitutionality of the challenged provisions of the Administrative Code.  See Ognibene v. Parkes, 599 F. Supp. 2d 434 (S.D.N.Y. 2009), aff'd 671 F.3d 174 (2d Cir. 2011).[3]  On December 16, 2011, the Court issued an Order, pursuant to the parties' stipulation, declaring NYC Administrative Code §§ 3-706(3)(a)(ii)-(iii) and (b)(ii)-(iii) unconstitutional and permanently enjoining their enforcement.[4]  The parties could not reach agreement as to the provisions of the Code that are the subjects of the instant motion practice – § 3-706(3)(a)(I) and (b)(I) ("Expenditure Limit Relief" provisions), and § 3-705(7) ("Sure Winner" provision).

Now before the Court are the parties' cross motions for summary judgment as to Counts XI, XII, XIII, and XIV of the Amended Complaint, which challenge the constitutionality of the Expenditure Limit Relief and Sure Winner provisions.[5]  Citizens Union, the Brennan Center for Justice, Common Cause/NY, the League of Women Voters of New York City and New York Public Interest Research Group (collectively, the "Organization Amici"), filed an amicus curiae brief in support of Defendants.  City Council candidates Brad Lander and Mark Winston Griffith (collectively, the "Candidate Amici") also filed an amicus curiae brief in

_____

contribution limits the amounts that lobbyists, and persons engaged in certain business dealings with the City of New York, could contribute to political campaigns; banned contributions by certain types of entities; and denied matching contributions in connection with campaign contributions by lobbyists and certain persons associated with them.

[3]     Familiarity with all prior proceedings is assumed.

[4]     These sections of the Code provided participating candidates with increased public financing when non-participating candidates received or spent funds above certain thresholds.

[5]     Counts XI and XIII of the Amended Complaint challenge the Sure Winner and Expenditure Limit Relief provisions on the grounds that they impermissibly chill the political speech of candidates and the speech and associational rights of contributors. Counts XII and XIV challenge the same provisions on the grounds that they are impermissibly vague.

support of Defendants.  The Court has considered carefully the submissions and arguments of

the parties and amici and, for the reasons explained below, Plaintiffs' motion for summary

judgment is granted in part and denied in part, and Defendants' motion for summary judgment is

granted in part and denied in part.


BACKGROUND

Unless otherwise indicated, the following material facts are undisputed.  New

York City's Campaign Finance Act (the "CFA") established the New York City Campaign

Finance Program (the "Program") in 1988.  (Defs.' 56.1 Stmt. ¶ 1.)[6]  The Campaign Finance

Board (the "Board") administers the Program and provides public matching funds to eligible

candidates running for Mayor, Comptroller, Public Advocate, Borough President and City

Council member.  (Id. at ¶ 2.)  Under the CFA, candidates are classified as "participating," "non-

participating," or "limited participating."  (Plaintiffs' 56.1 Statement ¶ 4.)  Participating

candidates are those who meet the requirements to participate in the public funding Program and

choose to participate by filing the appropriate written certification.  (Id. at ¶ 5.)  Non-

participating candidates are those who either choose not to participate in the Program or who do

not meet the requirements to do so.  (Id. at ¶ 6.)  Limited participating candidates are those who

file appropriate paperwork indicating their decision to file the requisite certification to be such a

candidate.  (Id. at ¶ 7.)  Limiting participating candidates agree, inter alia, to (1) not accept

contributions; (2) abide by the expenditure limits imposed on participating candidates; and (3)

forego the public funds available to participating candidates.  (Id.)

---

[6]    Citations to the parties' S.D.N.Y. Local Rule 56.1 Statements incorporate by
reference the evidence cited therein.

The CFA imposes certain obligations on all candidates, including required filing of financial disclosure statements reporting contributions and expenditures, limitations on the amount of contributions that can be received from any single contributor, and the obligation to respond to the Board's requests for documentation and information to verify compliance with the Program.  (Defs.' 56.1 Statement at ¶ 4.)  A participating candidate's campaign receives public matching funds for all eligible individual private contributions by New York City residents of up to $175, at a rate of six dollars in public funds for every dollar in private contributions (up to $1,050 in public funds per contributor).  (Id. at ¶ 5.)  Thus, a $100 qualifying contribution to a participating candidate by a New York City resident would be matched with $600 in public funds.  (Id.)  The Campaign Finance Program does not impose expenditure limitations on non-participating candidates.  (Id. at ¶ 9.)  Participating and limited participating candidates, however, are subject to expenditure limits.  (Id.)  For the 2013 primary and general elections, the expenditure limits for participating candidates running for offices covered by the CFA are as follows:

| | |
|---|---|
| Mayor: | $6,426,000 |
| Public Advocate & Comptroller: | $4,018,000 |
| Borough President: | $1,446,000 |
| City Council: | $168,000 |

(Id. at 10.)

Sections 3-706(3)(a)(i) and (b)(i) of the Administrative Code, commonly known as the "Expenditure Limit Relief" provisions, set out the circumstances under which the expenditure limits to which participating and limited participating candidates are usually subject may be altered.  Specifically, § 3-706(3)(a)(i) provides that, when the Campaign Finance Board has determined that a non-participating candidate has "spent or contracted or ha[s] obligated to spend, or received in loans or contributions, or both," more than half the applicable expenditure

limit for the relevant office, the expenditure limit applicable to a participating or limited

participating opponent will be increased to 150% of that limit.  (Code § 3-706(3)(a)(I); Defs.'

56.1 Statement at ¶ 35.)  Similarly, when a non-participating candidate raises or spends more

than three times the applicable expenditure limit for the relevant office, participating or limited

participating opponents will no longer be subject to any expenditure limit.

(Code § 3-706(3)(b)(I); Defs.' 56,1 Statement at ¶ 36.)

       Pursuant to Admin. Code Section 3-705(2)(b), eligible participating candidates

may receive public matching funds up to a maximum of 55% of the stated expenditure limits.

(Defs.' 56,1 Statement  at ¶ 12.)  This maximum public funding level does not change, even

though the expenditure limits may be increased or eliminated under certain circumstances.  (Id.

at ¶ 14.)  Accordingly, for participating candidates running for a covered office in 2013, the

maximum public matching funds available are as follows:

| | |
|---|---|
| Mayor: | $3,534,300 (55% of $6,426,000) |
| Public Advocate & Comptroller: | $2,209,900 (55% of $4,018,000) |
| Borough President: | $795,300 (55% of $1,446,000) |
| City Council: | $92,400 (55% of $168,000) |

(Id. at ¶ 15.)

       Normally, participating candidates who qualify for public financing may only

receive matching funds up to one-quarter of fifty-five percent -- that is, up to 13.75% -- of the

total applicable expenditure limit for the office for which they are running.  (Plaintiffs' 56.1

Statement at ¶ 12; Code § 3-705(7).)  Section 3-705(7) of the Administrative Code, commonly

known as the "Sure Winner" provision, provides participating candidates with additional public

funds when their opponents' spending and contributions cross certain trigger thresholds, and

when certain other circumstances are present.  Under the "Sure Winner" provision, the

maximum public funds payment for which a participating candidate is eligible will increase four-

fold, from 13.75% of the total applicable expenditure limit for the relevant office, to 55% of the total applicable expenditure limit.  (Plaintiffs' 56.1 Statement at ¶ 13.)  There are nine conditions, enumerated in § 3-705(7), that trigger this increase in public funding.

> 1) The Campaign Finance Board determines that the participating candidate's opponent has "spent or contracted or ha[s] obligated to spend, or received in loans or contributions, or both" more than 20% of the expenditure limit for the relevant office (the "20% Trigger").

> 2) The participating candidate's opponent is a non-participating or limited participating candidate with the ability to self-finance.

> 3) The participating candidate's opponent has received significant endorsements.

> 4) The participating candidate's opponent has had significant media exposure in the year preceding the election.

> 5) The participating candidate's opponent has received 25% or more of the vote in an election for public office within the last eight years.

> 6) The participating candidate's opponent's name is similar to the candidate's so as to result in voter confusion.

> 7) The participating candidate's opponent is chairman, president or district manager of a community board (for city council or borough-wide races only).

> 8) The participating candidate is opposed by a candidate whose close family member holds or has held elective office in the area within the past 10 years.

> 10) The participating candidate is opposed in a primary or special election for an office for which no incumbent is seeking re-election.

(See Code § 3-705(7).)  The Sure Winner provision, which was enacted in response to criticisms that public funds were being wasted on participating candidates in non-competitive races, seeks to avoid allocating excessive public funding to a participating candidate who faces no or minimal opposition.  (Defs.' 56.1 Statement at ¶16.)

## DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he non-moving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarole v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002). When deciding cross-motions for summary judgment, the standard to be used "is the same as that for individual motions for summary judgment and the court must consider each motion independent of the other." Schultz v. Stoner, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (internal quotations omitted).

Analysis of the constitutionality of the Expenditure Limit Relief and Sure Winner provisions is governed principally by three cases that have shaped campaign finance law in the country and this Circuit: Davis v. FEC, 554 U.S. 724 (2008), Arizona Free Enterprise Club's Freedom Club Pac v. Bennett, 131 S. Ct. 2806 (2011), and Green Party of Connecticut v. Garfield, 616 F.3d 213 (2d Cir. 2010).

In Davis, a candidate challenged the constitutionality of a federal election law provision that, under certain circumstances, imposed different campaign contribution limits for candidates competing for the same congressional seat. 554 U.S. at 728. Normally, federal election law caps contributions from individual donors during a 2-year election cycle at $2,300. Id. Section 319(a) of the Bipartisan Campaign Reform Act of 2002, commonly known as the "Millionaire's Amendment," however, provided that, when a candidate spent more than $350,000 in personal funds (a "self-financed candidate"), the candidate's opponent (the "non-self-financed candidate") could receive individual contributions at treble the normal limit, that is up to $6,900 rather than $2,300. Id. at 729. The Supreme Court determined that the

Millionaire's Amendment imposed a substantial burden on the First Amendment right to expend personal funds for one's own campaign speech, noting that, though the Amendment did "not impose a cap on a candidate's expenditure of personal funds, it impose[d] an unprecedented penalty on any candidate who robustly exercises that First Amendment right [because it] require[d] a candidate to choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations." Id. at 738-39.  The Court went on to explain that such a restriction could survive only if it was closely drawn to further a compelling state interest.  The Court held that, while the government has a compelling interest in preventing the actual and apparent corruption of the political process, the Millionaire's Amendment was not closely drawn to further that interest, emphasizing that a candidate's reliance on personal funds actually reduces the threat of corruption.  Id. at 740-41.  The Court rejected the government's alternative stated interest in equalizing candidates' relative financial resources, i.e. "leveling the playing field," as a legitimate government objective.  Id. at 741.

In Bennett, the Supreme Court considered a challenge to the matching funds provision of Arizona's public funding scheme.  131 S. Ct. 2806, 2813-14 (2011).  The Arizona law provided publicly funded candidates with an initial grant of public money, but also provided such candidates with additional "matching funds" if an opposing privately financed candidate's expenditures exceeded a certain amount.  After this trigger threshold was met, the opponent's expenditures over the threshold, and independent expenditures in opposition to the publicly financed candidate, were matched by government grants almost dollar for dollar, until the publicly financed candidate received twice his basic public grant amount.  In an election where a privately funded candidate faced multiple publicly financed candidates, each dollar over the

threshold raised or spent by the privately financed candidate resulted in an almost $1 increase in public funding to *each* of the publicly financed candidates.  Id. at 2814-15.

Following the logic of Davis, the Supreme Court found the Arizona law to be even more constitutionally problematic than the Millionaire's Amendment.  Id. at 2818.  In particular, the Court noted that, while the Millionaire's Amendment only raised contribution limits for publicly financed candidates -- meaning that such candidates still had to actually raise funds -- the Arizona law provided publicly financed candidates with a guaranteed additional grant of public money.  Id. at 2818-19.  Because the matching funds provision imposed a substantial burden on speech in the form of private political expenditures, the Court held that the provision was subject to strict scrutiny and could not stand unless justified by a compelling state interest.  Id. at 2824.  Arizona proffered that the law indirectly served the state's compelling anti-corruption interest by ensuring that enough people participated in the public funding system; the Court rejected this argument, holding that "a state may [not] burden political speech -- to the extent the matching funds provision does -- to ensure adequate participation in a public funding system."  Id. at 2828.

Finally, in Green Party, the Second Circuit considered the constitutionality of certain provisions of Connecticut's campaign finance scheme (the "Citizens Election Program" or "CEP"), which had been enacted in response to several corruption scandals.  See 616 F.3d 213, 219 (2d Cir. 2010).  The CEP's "distribution formulae" provided grants, in amounts determined by reference to the historical costs of highly competitive races, to candidates for public office.  The amounts were, however, reduced where the candidates ran unopposed or

faced opposition only from "minor party" candidates.[7]   The Green Party plaintiffs challenged

this provision as one that violated the First and Fourteenth Amendments by giving "major party"

candidates an undue advantage over "minor party" candidates, because the formulae resulted in

grants to major party candidates running in unopposed or uncompetitive races that were higher

than actual historic fundraising in such races.  Id. at 240.   The Second Circuit rejected that

challenge, holding that there was insufficient evidence "that the CEP's distribution formulae

have reduced the strength of minor parties below that attained before the CEP became effective."

Id. at 242.  No issue was raised regarding the impact of the distribution formulae on the political

speech of privately funded candidates.

          The CEP also included a scheme, similar to the expenditure "matching funds"

scheme struck down in Bennett, under which participating candidates were eligible to receive

additional public funds if their non-participating opponents reached an expenditure threshold.

Specifically, the publicly funded candidate would receive grants of an additional 25% of the

basic public funding amount when the opponent's contribution or expenditure total reached

100%, 125%, 150% and 175% of the publicly funded candidate's expenditure limit, for a

maximum additional grant of 100% of the basic amount.  Id. at 222.  A further matching

provision was triggered by independent expenditures (by individuals or political advocacy

groups unaffiliated with the publicly funded opponent) advocating the defeat of the publicly

funded candidate.  When such expenditures, in the aggregate and when combined with the

spending of the non-publicly funded opponents in the race, exceeded the CEP grant amount,

---

[7]          Unless a party has fielded a candidate for governor who received 20% of the vote in the previous election, or its membership comprises at least 20% of the voters in the state, it is classified as a "minor party" under the CEP.  Green Party, 616 F.3d at 219-220.

additional funding was to be disbursed to the publicly-funded candidate "on a dollar per dollar

basis to match the amount of the independent expenditure(s) in excess of the full grant amount."

Id (internal citation omitted).  These matching grant formulae were challenged in Green Party as

violative of the First Amendment right to use personal funds for campaign speech.  The Second

Circuit struck them down as unconstitutional, holding that the provisions imposed substantial

burdens on speech which could not be justified by the state's asserted interests in eliminating

corruption or leveling electoral opportunities.  The Green Party Court also rejected as

insufficient the state's asserted interest in encouraging participation in the public funding

program, an interest that was merely derivative of the anti-corruption goal.  Id. at 246.


New York City CFA Expenditure Limit Relief Provisions

          Plaintiffs here argue that, like the expenditure matching grant provisions in

Bennet and Green Party, and the asymmetrical contribution limits in Davis, the Expenditure

Limit Relief provisions of the Administrative Code[8] violate the First Amendment by imposing a

penalty on candidates who use personal funds to support their own candidacies.  As previously

noted, the parties have stipulated to the unconstitutionality of the matching-funds elements of the

Expenditure Limit Relief provisions.  (See Dec. 16, 2011 Order, ECF No. 131.)  The instant

challenge is thus focused on the remaining features of the Expenditure Relief provisions, which

raise or eliminate expenditure caps normally imposed by the public financing system but do not

provide publicly financed candidates with any additional funds or even change the contribution

limits applicable to them.  If a participating candidate wishes to spend additional money, beyond

the previously imposed expenditure limit, that candidate bears full responsibility for raising such

---

[8]          Code §§ 3-706(3)(a)(i) and (b)(i).

additional funds.

The limited nature of the relief provided distinguishes the Expenditure Relief provisions in critical respects from the matching funds and asymmetrical contribution limit relief provisions that were invalidated in Bennett, Green Party, and Davis.  While the campaign finance statutes in Green Party and Davis burdened the free speech activity of privately funded candidates by directly increasing the campaign warchests of publicly funded candidates in response to private expenditures, the Expenditure Relief provisions at issue here merely put publicly funded candidates in the same position as non-publicly funded candidates -- they have the opportunity to spend competitively, provided that they can raise the funds with which to do so.  This opportunity gives them no advantage over privately funded candidates, and certainly imposes no substantial burden on the privately funded candidates' decision to exercise their First Amendment rights.  See Bennett, 131 S. Ct. at 2818-19 (recognizing that raising a limit is less burdensome than a "direct and automatic" monetary grant in response to another candidate's speech).  Unlike the matching funds provisions in Bennett and Green Party, the Expenditure Limit Relief provisions do not put non-participating candidates to the choice of refraining from speech or causing their participating opponents to receive direct infusions of public money.  Cf. Green Party, 616 F.3d at 244 (provision imposed substantial burden because effect was that, "as Candidate A spends more and more of her own money above a certain threshold, Candidate B will receive more and more public money to compensate").

The Expenditure Limit Relief provisions are also materially distinguishable from the asymmetrical contribution limit scheme struck down in Davis.  In Davis, the Millionaire's Amendment provided that, when a self-financing candidate spent more than $350,000 in personal funds, an "asymmetrical regulatory scheme [came] into play" which held the self-

financing candidate subject to a $2,300 contribution limit, but permitted the candidate's opponent (the non-self-financing candidate) to receive contributions at treble the normal limit (e.g. $6,900 rather than $2,300).  544 U.S. at 729.  The Supreme Court found this scheme impermissibly burdensome, stating that "we have never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other" and finding such an asymmetrical scheme "antithetical to the First Amendment."  Id. at 738, 744. The Supreme Court made clear, however, that "[i]f [the Millionaire's Amendment had ] simply raised the contribution limits for all candidates, Davis' argument would plainly fail."  Id. at 737.

The Expenditure Limit Relief provisions are similar to the across-the-board elevated contribution limits implicitly approved in Davis.  Rather than imposing asymmetrical limits on candidates in response to speech, the Expenditure Limit Relief provisions raise and remove expenditure caps from participating candidates, leaving them in the same position as their non-participating opponents, who were never subject to expenditure limits.  Crucially, the amount of public funding a participating candidate may receive is not affected by an increase in the expenditure limit.  Even where a participating candidate's expenditure limit is removed entirely, the participating candidate's public maximum funding limit remains set at 55% of the original expenditure limit.  See Code § 3-705(2).[9]

Finally, the Expenditure Limit Relief provisions have never been applied in an election while divorced from the Code's accompanying matching funds provisions, and there is

---

[9]       For example, the Admin. Code. sets an expenditure limit of $168,000 for participating candidates in a City Council race.  If a non-participating opponent spends or raises more than $84,000, the participating candidate's expenditure limit is raised to $252,000.  If a non-participating opponent spends or raises more than $504,000, the participating candidate's expenditure limit is removed entirely.  No matter what the non-participating candidate spends or raises, the participating candidate may never receive more than 55% of $168,000, or $92,400, in public funds.

no evidence in the record that the remaining Expenditure Limit Relief provisions have, or would, chill a candidate's speech.  See Green Party, 616 F.3d at 233 ("the court should avoid speculative reasoning and focus instead on the evidence, if any, of the system's practical effects"); cf. Bennett, 131 S. Ct. at 2822 (striking down matching funds provisions in part because record contained "examples of specific candidates curtailing fundraising efforts, and actively discouraging supportive independent expenditures, to avoid triggering matching funds").

Accordingly, Plaintiffs have failed to demonstrate that the remaining Expenditure Limit Relief provisions, facially or as applied, violate the First Amendment rights of non-participating candidates.

New York City CFA Sure Winner Provision

The Sure Winner provision, Section 3-705(7) of the Administrative Code, by contrast, affects directly the amount of public funding that is made available to participating candidates.  It includes a monetary triggering provision as well as various circumstantial triggering provisions.  The Court will address these provisions in turn.

Section 3-705(7)(a): the 20% Trigger

Section 3-705(7)(a) of the Administrative Code provides that, when a participating candidate's opponent (participating or not) spends, becomes obligated to spend, or receives in loans or contributions more than 20% of the expenditure limit for the relevant office, the participating candidate is eligible for extra matching funds, up to 55% of the expenditure limit for the relevant office, as opposed to the standard grant of funds up to only 13.75% of the

expenditure limit.  Code § 3-705(7)(a).[10]  This triggering provision is similar to, albeit less direct

than, the matching funds provisions struck down in both <u>Bennett</u> and <u>Green Party</u>.  Under the

Arizona campaign finance legislation that was challenged in <u>Bennett</u>, "[o]nce a privately

financed candidate ha[d] raised or spent more than the State's initial grant to a publicly financed

candidate, each personal dollar spent by the privately financed candidate result[ed] in an award

of almost one additional dollar to his opponent."  131 S. Ct. at 2818.  Similarly, in <u>Green Party</u>, a

non-participating candidate's contributions or expenditures, and certain independent

expenditures beyond a specified threshold, triggered the release of additional public grants to

publicly financed candidates.  616 F.3d at 221-22.  Like the triggering provisions in <u>Bennett</u> and

<u>Green Party</u>, § 3-705(7)(a)'s  20% trigger forces a candidate to choose between mounting a

"non-competitive" campaign or triggering an opponent's access to additional public money.  To

be sure, that access is less direct -- the funds are available to match additional contributions to

the campaign of the publicly funded candidate and are not released in direct response or

proportion to the non-participating candidate's expenditures or support.  Nonetheless,

§ 3-705(7)(a) ties a publicly-provided financial advantage for the participating candidate to the

exercise of First Amendment rights, burdening those rights in a substantial way by enabling the

participating candidate to leverage his or her fundraising with additional public money.  The

arguments of Defendants and the Amici to the contrary are unavailing.

---

[10]     The Defendants and Amici characterize the Sure Winner provision as a mechanism
that limits money otherwise available to publicly funded candidates, rather than one
that increases public funding under the specified circumstances.  This
characterization is consistent with the statutory language, but does not change the
fundamental fact that the amount of public funding available to a participating
candidate is tied, by the 20% provision, to other candidates' exercise of their free
speech rights in the form of campaign expenditures and/or contributors' exercise of
their associational rights.

Defendants analogize the 20% trigger to the "distribution formulae" that were upheld in Green Party, arguing that Second Circuit's rejection of the constitutional challenge in that case compels the same result here.  The Green Party Court did not, however, address the question of whether the fact that a public funding grant increases when a participating candidate faces a competitive opponent substantially burdens the opponent's First Amendment rights.  The plaintiffs in Green Party challenged the distribution formulae solely on the ground that, because the CEP full grant amount was based on average expenditures in the most competitive races, the formulae burdened minor party candidates' political opportunities by providing major party candidates with financing in amounts much higher than historically typical expenditure levels.  616 F.3d at 239-40.  The Second Circuit had no occasion, on the record before it, to consider the impact of the distribution formulae on self-funded candidates whose use or receipt of resources triggered larger public funding allocations to participating candidates.  Thus, the Second Circuit's ruling upholding the distribution formulae in Green Party is in no way determinative of the proper outcome here.  Indeed, the Circuit's disposition of the challenges to the expenditure-matching provisions in Green Party suggests that the distribution formulae would not have survived a challenge focused on the burden on the exercise of well-funded opponents' free speech rights as opposed to alleged diminution of the voices of less formidable opponents.

Citing the legislative history of the Sure Winner provision, Defendants and Amici note that the Sure Winner provision was enacted, following complaints about public funding of candidates who faced little or no opposition, as a means of avoiding waste of public funds in connection with non-competitive races.  They urge this Court to evaluate the 20% trigger as a threshold eligibility criterion for public funding rather than as a mechanism that grants supplemental public funding in response to the exercise of free speech rights.  Among other

arguments, they assert that the provision of authorized funding in increments is no more of a

burden than the provision of the full authorized public funding amount to all candidates, all at

once.[11]  The Supreme Court rejected these arguments in <u>Bennett</u>.  There, the state asserted that

plaintiffs did not claim that "a single lump sum payment to publicly funded candidates,

equivalent to the maximum amount of state financing that a candidate can obtain through

matching funds, would impermissibly burden their speech," and that, accordingly, "if providing

all the money up front would not burden speech, providing it piecemeal does not do so either."

131 S. Ct. at 2824.  Here, the City similarly argues that the 20% trigger serves only to reduce the

amount of money to which a candidate would normally be entitled when the candidate faces an

opponent who does not spend or raise a certain amount.  <u>See also Bennett</u>, 131 S. Ct. at 2824

(state argued that "such incremental administration [was] necessary to ensure that public funding

is not under-or over-distributed").  The <u>Bennett</u> Court rejected these arguments unequivocally,

finding that:

> It is not the amount of funding that the State provides to publicly financed
> candidates that is constitutionally problematic in this case.  It is the *manner* in
> which that funding is provided -- in direct response to the political speech of
> privately financed candidates and independent expenditure groups.  And the fact
> that the State's matching mechanism may be more efficient than other alternatives

---

[11]  Defendants also point to language from <u>Green Party</u> holding that a "public financing system may establish qualification criteria that condition public funds on a showing of 'significant' public support."  616 F.3d at 233.  Defendants take this language out of context.  In <u>Green Party</u>, the Second Circuit concluded that it was constitutional for Connecticut to require candidates to make a preliminary showing of *their own* public support in order to initially qualify for public funding.  To this end, the court relied on language from <u>Buckley v. Valeo</u>, that the government has an "interest in not funding hopeless candidacies with large sums of public money [which] necessarily justifies the withholding of public assistance from candidates without significant public support."  616 F.3d at 231 (quoting <u>Buckley v. Valeo</u>, 424 U.S. 1, 96 (1976)).  <u>Green Party</u> did not, however, hold or even imply that the government could increase a grant of public funds to a candidate in response to an opponent's fundraising.

-- that it may help the State in 'finding the sweet-spot' or 'fine-tuning' its financing system to avoid a drain on public resources -- is of no moment; 'the First Amendment does not permit the State to sacrifice speech for efficiency.'

Id. (emphasis added, internal quotations and citations omitted).

Defendants also argue that no candidate would realistically be compelled by the 20% trigger to refrain from mounting a competitive campaign simply to deprive his participating opponent of access to a greater amount of public funding.  But whether or not a candidate ultimately chooses to mount a non-competitive campaign is irrelevant.  See id. at 2823 ("[t]hat a candidate is willing [to bear the burden of spending above the cap] does not make the law any less burdensome"); Davis, 554 U.S. at 739 (that candidates may choose to make personal expenditures to support their campaigns despite the burdens imposed by the Millionaire's Amendment does not change the fact that they must "shoulder a special and potentially significant burden if they make that choice").  The Court finds that, like the matching funds provisions in Bennett, the 20% trigger provision places a substantial burden on candidates' First Amendment free speech rights.  Accordingly, the provision is subject to strict scrutiny and "cannot stand unless it is justified by a compelling state interest."  Arizona, 131 S. Ct. at 2824 (internal quotations omitted).

The Supreme Court has recognized only the elimination of corruption or the perception of corruption as interests sufficiently compelling to justify burdening free speech rights in the political campaign finance context.  See, e.g., Davis, 554 U.S. at 740.  Defendants assert that the Sure Winner provision, as part of the CFA, is intended to "minimize the fact and appearance of improper influence on elected officials through the establishment of a system of public financing."  (Defs.' Brief at 14; see also Defs.' 56.1 Statement at ¶17 (the purpose of the provision is to "encourage a continued high level of participation in the voluntary program and

to protect public funds from fraud and unnecessary expenditures").)  Encouragement of public

campaign finance participation as a means of suppressing corruption and the perception thereof

is simply another facet of the recognized anti-corruption interest.  Green Party, 616 F.3d at 246.

The Supreme Court made quick work of the rejection of efficient use of public resources as a

justification in Bennett -- "the First Amendment does not permit the State to sacrifice speech for

efficiency."  131 S. Ct.  2824 (citation omitted).  The salient question thus is whether the

anticorruption interest is sufficiently served by the 20% trigger mechanism to justify the

substantial burden placed by that mechanism on free speech.  The Supreme Court's decision in

Bennett makes clear that it is not.  See Bennett, 131 S.Ct. at 2827 ("the fact that burdening

constitutionally protected speech might indirectly serve the State's anticorruption interest, by

encouraging candidates to take public financing, does not establish the constitutionality of the

matching funds provision"); id. ("the fact that the State may feel that the matching funds

provision is necessary to allow it to 'find[] the sweet-spot' and 'fine-tun[e]' its public funding

system, to achieve its desired level of participation without an undue drain on public resources,

is not a sufficient justification for the burden").  Because the 20% trigger substantially burdens

speech and is not justified by a compelling state interest, it violates the First Amendment and

cannot stand.  Plaintiffs have met their burden of demonstrating that the 20% trigger feature of

the Sure Winner provision is unconstitutional on its face, and are entitled as a matter of law to

judgment in their favor on that aspect of Counts XI and XII.

    Sections 3-705(7)(b)(1) - (7) and 3-705(7)(c): the Circumstantial Triggers

        In addition to the monetary 20% trigger provision, the Sure Winner provision

includes several circumstantial triggering provisions that also entitle a participating candidate to

the opportunity to receive matching funds for contributions up to the full limit for the relevant

office.  The parties proffer little in the way of specific argument regarding these provisions: Plaintiffs lump them together with the 20% trigger and argue that all of the Sure Winner provisions are unconstitutional; Defendants and Amici proffer defenses of the 20% trigger as discussed above.  The first such circumstantial trigger is the *ability* of a non-participating or limited participating opponent to self-finance.[12]  This provision does not, on its face, tie any benefit or advantage afforded to a participating candidate to an opponent's exercise of free speech rights.  Nor have Plaintiffs proffered any evidence indicative of an exercise-based burden imposed by the statute as applied.

The remaining circumstantial triggers -- endorsements by other politicians, media exposure over the preceding twelve months, levels of success in prior elections, potential name confusion, incumbency in certain community board offices, close personal relationships to past or present officeholders in the same geographical area, and participation in a contested primary or special election in which there is no incumbent seeking re-election[13] – are similarly facially divorced from the exercise of other candidates' financial (or other) free speech rights.  Plaintiffs have proffered no evidence in support of their contention that the provisions, as applied, impose any substantial burden on the exercise of First Amendment rights.

There are, thus, no genuine disputes of material fact and Defendants are entitled as a matter of law to judgment dismissing Plaintiffs' claims of unconstitutionality as to all aspects of the Sure Winner provision other than the 20% trigger provision.

---

[12]     A participating candidate may receive matching funds for contributions up to the full limit for the relevant office if "the participating candidate is opposed by (i) a non-participating candidate or (ii) a limited participating candidate, and provides a factual basis with supporting documentation of such candidate's ability to self finance."  Code § 3-705(7)(b)(1).

[13]     See Code §§ 3-705(7)(b)(2)-(7) and 3-705(7)©.

CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted as to Counts XI and XII of the Amended Complaint, insofar as those Counts challenge Code § 3-705(7)(a), and denied in all other respects. Accordingly, the Court hereby declares Code § 3-705(7)(a) facially unconstitutional. Defendants' motion for summary judgment is granted as to Counts XIII and XIV of the Amended Complaint. Because there are no material issues of disputed fact and, as explained above, Plaintiffs have not met their burden of demonstrating unconstitutionality, Defendants are also entitled as a matter of law to summary judgment as to the remaining aspects of Counts XI and XII.[14] This Memorandum Opinion resolves docket entry nos. 134 and 144.

A status conference is scheduled for April 12, 2013, at 2:00 p.m., in Courtroom 17C.

SO ORDERED.

Dated: New York, New York
        April 4, 2013

                                        _____/S_____
                                        LAURA TAYLOR SWAIN
                                        United States District Judge

---

[14]    While the Amended Complaint challenges the relevant provisions on the grounds that they both violate the First Amendment (Counts XI and XIII) and are impermissibly vague (Counts XII and XIV), the parties' briefs do not address the issue of vagueness. Plaintiffs have not established that the Expenditure Limit Relief and Sure Winner provisions are unconstitutionally vague, and so their motion for summary judgment is denied as to Counts XII and XIV. In light of Plaintiffs' failure to establish unconstitutionality, and the absence of material issues of disputed fact, Defendants' cross-motion for summary judgment is granted as to Counts XII and XIV.